HE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

United States of America                    )
*ex rel.*  Robert Scott Dillard,            )
                                            )
  Plaintiff-Realtor,             )
                                            )  C/A No: 6:16-cv-02948
v.                                          )
                                            )
Fluor Corporation Inc.,                     )
Fluor Enterprises Inc., and                 )
Fluor Intercontinental Inc.,                )
                                            )
  Defendants.                     )

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................... ii

INTRODUCTION .................................................................................... 1

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF
     UNDISPUTED FACTS ....................................................................... 2

PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS ............................... 15

ARGUMENT ........................................................................................ 21

A.     STANDARD OF REVIEW ................................................................ 21

B.     PLAINTIFF HAS ESTABLISHED A *PRIMA FACIE* CASE OF RETALIATION ........ 22

     1.     Fluor Erroneously Contents That It Is Undisputed That Gross Was the Only
           Individual That Made the Decision to Include Dillard In the RIF ......................... 22

     2.     Plaintiff Has Established a Causal Connection Between the Protected Activity
           and Dillard's Inclusion in the RIF ......................................................... 27

C.     FLUOR HAS FAILED TO PRODUCE SUFFICIENT EVIDENCE OF A NON-
     RETALIATORY REASON FOR DILLARD'S TERMINATION .................................. 30

D.     DILLARD HAS PRESENTED SUBSTANTIAL EVIDENCE THAT FLUOR'S
     TERMINATION FO DILLARD WAS PRETEXTUAL ....................................... 30

CONCLUSION ....................................................................................... 35

i

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ........................................................................................ 21

*Anderson v. Westinghouse Savannah River Co.*,
  406 F.3d 248 (4th Cir. 2005) ......................................................................... 34

*Beeler v. Norton Healthcare, Inc.*,
  No. 3:17-CV-573-DJH-RSE, 2020 WL 1265419 (W.D. Ky. Mar. 16, 2020) ................. 25

*Brach v. Conflict Kinetics Corp.*,
  No. 1:16-CV-978, 2017 WL 3267961 (E.D. Va. July 31, 2017) ...................................... 28

*Carr v. SRA International, Inc.*,
  No. 20-2692, 2021 WL 2285231 (3d Cir. June 4, 2021) ........................................... 25, 26

*Cf. Emmel v. Coca-Cola Bottling Co. of Chicago*,
  95 F.3d 627 (7th Cir. 1996) ............................................................................ 31

*E.E.O.C. v. Sears Roebuck and Co.*,
  243 F.3d 846 (4th Cir. 2001) .......................................................................... 31

*E.E.O.C. v. Siemens Maint. Servs., LLC*,
  No. C/A 3:07-1769-JFA, 2009 WL 363213 (D.S.C. Feb. 10, 2009) ............................... 34

*Farrell v. Planters Lifesavers Co.*,
  206 F.3d 271 (3d Cir.2000) ........................................................................ 27, 29

*Garrett v. Mercedes-Benz Fin. Servs. USA LLC*,
  331 F. Supp. 3d 699 (E.D. Mich. 2018) ............................................................ 31

*Harris v. hhgregg, Inc.*,
  No. 1:11CV813, 2013 WL 1331166 (M.D.N.C. Mar. 29, 2013) ..................................... 22

*Hurlbert v. St. Mary's Health Care Sys., Inc.*,
  439 F.3d 1286 (11th Cir. 2006) ...................................................................... 33

*Irving v. PAE Gov't Servs., Inc.*,
  296 F. Supp. 3d 761 (E.D. Va. 2017), aff'd, 736 F. App'x 412 (4th Cir. 2018) ............. 28

*Kralowec v. Prince George's County, Maryland*,
  503 F. Supp. 985 (D.Md.1980), *aff'd*, 679 F.2d 883 (4th Cir.), *cert. denied*, 459 U.S. 872
  (1982) ........................................................................................ 23, 24, 25

*Laxton v. Gap, Inc.*,
    333 F.3d 572 (5th 2003)...................................................................... 31

*Lowery v. CSX Transportation, Inc.*,
    690 F. App'x 98 (4th Cir. 2017) ..................................................... 26

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)......................................................................... 30

*Merritt v. Old Dominion Freight Line, Inc.*,
    601 F.3d 289 (4th Cir. 2010) ......................................................... 32

*Mohammed v. Cent. Driving Mini Storage, Inc.*,
    128 F. Supp. 3d 932 (E.D. Va. 2015) ....................................... 27, 29

*Mulhall v. Ashcroft*,
    287 F.3d 543 (6th Cir. 2002) ......................................................... 23

*Nifong v. SOC, LLC*,
    234 F. Supp. 3d 739 (E.D. Va. 2017) ........................................... 28

*Pascual v. Lowe's Home Centers, Inc.*,
    193 F. App'x 229 (4th Cir. 2006) ................................................. 28

*Perry v. Kappos*,
    489 F. App'x 637 (4th Cir. 2012) ................................................. 28

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133 (2000)......................................................................... 34

*Rowe v. Marley Co.*,
    233 F.3d 825 (4th Cir. 2000) ......................................................... 34

*Rudolph v. Nat'l R.R. Passenger Corp.*,
    ARB Case No. 11-037, 2013 WL 1385560 (Dep't of Labor Mar. 29, 2013)................... 26

*Staub v. Proctor Hosp.*,
    562 U.S. 411 (2011)......................................................................... 26

*Stiles v. Gen. Elec. Co.*,
    986 F.2d 1415, 1993 WL 46889 (4th Cir. 1993) ............................ 33

*United States ex rel. Bachert v. Triple Canopy, Inc.*,
    321 F. Supp. 3d 613 (E.D. Va. 2018) ........................................... 31

*United States ex rel. Complin v. N. Carolina Baptist Hosp.*,
    818 F. App'x 179 (4th Cir. 2020) ................................................. 27

*Vander Boegh v. EnergySolutions, Inc.*,
    536 F. App'x 5220 (6th Cir. 2013) ............................................................... 23

*Waddell v. Small Tube Products, Inc.*,
    799 F.2d 69 (3d Cir.1986)............................................................................. 29

**Statutes**

31 U.S.C. § 3730(h) .............................................................................................. 1

**Rules**

Fed.R.Civ.P. 56(c) ............................................................................................... 21

## INTRODUCTION

Plaintiff, Robert Scott Dillard, brings this action against Defendants Fluor Corporation, Inc., Fluor Enterprises, Inc. and Fluor Intercontinental, Inc. ( "Fluor) alleging that he was retaliated against in violation of the False Claims Act (FCA), 31 U.S.C. § 3730(h). Under the FCA, employees are protected from adverse employment actions "because of lawful acts done by the employee … in furtherance of an action under [the FCA]." In 2015, while employed by Fluor in Afghanistan, Dillard reported discrepancies in inventory reports that he believed may have been manipulated in an attempt to defraud the U.S. Government. The evidence shows that following his report, Dillard's employment with Fluor was terminated in retaliation for this protected activity.

In its motion, Fluor first argues that Gregg Gross had sole responsibility for staffing decisions and had no knowledge Dillard had made a complaint.[1] However, this argument should be rejected as there is substantial evidence that Country Manager Mark O'Neill had final authority over staffing decisions and final approval over any RIFs. In addition, there is substantial evidence from which a reasonable jury could conclude that Gross was aware that it was Dillard that had made the complaint, including contradictory and inconsistent testimony from Gross himself. The only evidence to the contrary is Gross's self-serving testimony that he did not know.

Fluor also argues that Dillard cannot establish causation because Dillard's inclusion in the RIF occurred "nearly four months"[2] after he made his complaint regarding the inventory reports. Def's Mem. at 2. However, Plaintiff does not rely solely on temporal proximity to establish causation. In fact, as described in more detail below, the delay between Dillard's report and his

---

[1] In its motion, Fluor does not argue that Dillard cannot establish the first element of a *prima facie* case of retaliation— that his reporting of inventory issues is protected activity or activity "in further of an action under [the FCA]." 31 U.S.C. § 3730(h)(1).

[2] Fluor is incorrect that this time period was "nearly four months". Dillard reported the inventory discrepancies on July 27 or 28, 2015 and if Gross's testimony is to be believed, Dillard was added to the RIF at the latest within the first week of November but before November 6, 2015. Thus, at most, there was a gap of three-months and approximately one week between the protected activity and Dillard's inclusion in the RIF.

inclusion in the RIF is, in and of itself, causal evidence supporting Dillard's retaliation claim. Other evidence of causation includes Gross's inconsistent testimony as to the reasons Dillard was added to the RIF, Gross's inconsistent testimony as to the timeline of events relating to when he decided to add Dillard to the RIF, as well as the fact that there is absolutely no written documentation in the record to show that Dillard was contemplated as being included in the RIF.

Lastly, Fluor also contends that it has offered a legitimate, non-retaliatory reason for Dillard's termination: that Fluor was "drawing down", looking for cost savings and "flattening" the organization. Direct evidence demonstrates that this reason is pretextual. There is absolutely no written or contemporaneous documentation showing that Fluor had planned to include Dillard in the RIF and Fluor deviated from its normal RIF procedures with respect to Dillard's inclusion in the RIF. Further, evidence of Fluor's actions during this time period contradict it's purported reasons for including Dillard in the RIF. For example, during this same time, Fluor replaced Jarrold Reeves as Director of the Materials Management Group (MMG) with Gross. Given that Gross's salary was higher than that of Reeves it completely contradicts Fluor's argument that it was looking to "save costs" and flatten the organization at this time.

For the reasons set forth herein, the Court should deny Fluor's motion for summary judgment.

### PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED FACTS[3]

1.    Disputed that Dillard, as a Tier I employee, "could be moved from one project to another at Fluor's discretion." The cited testimony does not support this statement.

2.    Undisputed.

---

[3] Plaintiff's responses to Defendants' Statement of Undisputed Facts correspond to the numbered facts contained in Defendants' Motion for Summary Judgment.

3.      Undisputed with the clarification that the property, which includes materials Fluor was responsible for managing were either furnished by the government *or* contractor acquired by Fluor.

4.      Disputed that the percentages are "approximates" as the cited testimony does not support this statement. Dillard testified that these numbers were "a very rough estimation" of how he spent his time working as Deputy Director of the MMG. Ex. 1, Dillard Dep. at 129:8.

5.      Disputed that "Fluor closely coordinated its staffing with the government to align its labor costs with the needs of the mission." The cited testimony does not support this statement. O'Neill testified that the labor force "level was adjusted continuously based on changing requirements from the [government]" but never testified about "closely coordinating" with the government. Ex. 2, O'Neill Dep. at 57:2-4.

6.      Disputed to the extent that Fluor contends that the Basis of Estimate ("BOE") submitted to the government in 2015 for the Option Year 4, Extension 1 of Task Order 5 ("OY4 Extension") was an *initial* estimate. The cited testimony does not support this statement. In addition, the 2015 BOE would have been informed by years of previous performance on the contract. *See, e.g.*, Ex. K to Defs' Mem. (Request for Proposal).

7.      Undisputed.

8.      Disputed that "establishing appropriate staffing levels was an important part of managing the budget." The cited testimony does not support this statement. O'Neill testified that "adjusting manning levels appropriately" was part of the continuous obligation to the government to evaluate its requirements but he did not refer to the budget. Ex. 2, O'Neill Dep. at 57:11-14.

Disputed that each department head was responsible for managing the staffing within his or her department and that Gregg Gross, the Director of the MMG, was responsible for managing

the MMG staffing levels. The Country Manager, Mark O'Neill, and Fluor leadership in South Carolina had final approval on staffing decisions. Ex. 2, O'Neill Dep. at 70:22-73:13, 85:10-86:6; Ex. 3, Gross Dep. at 222:5-21; 243:9-14; Ex. 4, Howard Dep. at 164:9-14, 166:3-7. O'Neill testified that Fluor leadership in Greenville, South Carolina had the "final authority" on any staffing changes made and could override O'Neill's staffing decisions. Ex. 2, O'Neill Dep. 70:22-73:13. O'Neill also testified that if leadership in Greenville did not intervene, he had authority to make decisions regarding staffing levels. *Id*. O'Neill further testified that he would have specifically approved Gross's staffing plan for the MMG. *Id*. at 85:10-86:6. Gross also testified that he and Dillard presented three courses of action with respect to the Reduction in Force ("RIF") in October 2015 and O'Neill gave Gross and Dillard the direction to plan and execute the RIF. Ex. 3, Gross Dep. at 222:5-21; 243:9-14. Deputy Project Manager Preston Howard also testified that the Country Manager would have approved the final RIF plan. Ex. 4, Howard Dep. at 164:9-14, 166:3-7. Lastly, on August 3, 2015, just a few days after Dillard's report of possible fraud against the government in connection with the inventory reports (Ex. 1, Dillard Dep. at 234:5-9, 243:12-19), Reeves and Dillard presented O'Neill a RIF Plan for implementation. *Id*. at 189:9-11. O'Neill declined to implement that RIF plan on the grounds that he was "concerned about what would happen if we released all these people and they went and got hired by our competitors." *Id*. at 188:25-189:24. That Reeves did not thereafter implement the staffing changes proposed and rejected by O'Neill anyway is also evidence from which a reasonable jury could determine that O'Neill had the ultimate authority over any RIF or staffing decisions. *Id*.

9.     Disputed that Project Controls did not make recommendations as to which specific positions should be eliminated as part of any given RIF. Holly Snow testified that Project Controls "gave *recommendations* that the – that the client did not like seeing Deputy positions on org

4

charts throughout the entire organization. So that was one reason for the Organizational Mod to remove [Dillard's] position." Ex. 5, Snow Dep. at 75:10-18 (emphasis added). Scott Roesler from Project Controls testified that "we made recommendations to management" and gave the example that, if there was a position that had not been filled, that Project Controls would "approve that that position is available and let [the department] bring that person in." Ex. 6, Roesler Dep. at 33:17-34:15, 37:15-38:14. The BOE prepared by Project Controls listed positions by tier, job, classification and grade and each RIF was designed to better align with the BOE prepared by Project Controls. Ex. M. to Defs' Mem. (Dkt. 146-14) (2015 M&A BOE); Ex. 1, Dillard Dep. at 189:15-18.

Disputed that the relevant department head was responsible for deciding which position should be eliminated. *See* Plaintiff's Response to Defendants' Statement of Undisputed Facts ("Pls Resp to Def's SOF") at ¶8, *supra*.

Disputed to the extent that Fluor contends that downsizing of departments "happen[ed] throughout the year" during the entire time period it was performing under the LOGCAP contract. For example, there was no department-wide RIF to the MMG in 2013. Ex. 7, Declaration of Robert Scott Dillard ("Dillard Decl.") at ¶3. Following the 2015 RIF, there were no other RIFs of the MMG through at least November 2017. Ex. 3, Gross Dep. at 345:16-24 (testifying that he did not work on any further RIFs and that he departed Afghanistan in November 2017). Lastly, Gross testified that the MMG *added* employees over the time period that he was in Afghanistan. Ex. 3, Gross Dep. at 346:6-12.

10.    Undisputed that Dillard's position was eliminated as part of a RIF but disputed to the extent Fluor contends that Dillard's position was not eliminated in retaliation for protected activity. Disputed that the RIF was "substantial". The cited evidence does not support this

statement. *See also* Ex. 7, Dillard Decl. at ¶4 ("Fluor had already significantly reduced or drawn down the scope of its sites in Afghanistan" by the time it was performing under the OY4 extension).

11.    Disputed that, during this time period, personnel levels were reduced because the scope of work that Fluor was to perform was drawing down. By the time Fluor started its performance under the OY4 Extension, Fluor had already significantly reduced or drawn down the scope of its sites in Afghanistan under the LOGCAP contract from approximately 76 sites to 9 sites. Ex. 7, Dillard Decl. at ¶4; Ex. K to Defs' Mem. (Dkt. 146-12) at FLUOR-DIL_00000054587 (listing nine sites in the RFP). During the OY4 performance, Fluor's sites remained relatively constant, fluctuating between 9 to 8 sites, with one site (Bagram) comprising over 75% of Fluor's total scope. Ex. 7, Dillard Decl. at ¶4.[4] Gross testified that with the 2015 RIF, "we were looking for efficiencies" not that Fluor was responding to a reduced scope of work. Ex. 3, Gross Dep. at 224:12-14. Gross also testified that Fluor later added employees to the MMG which supports that the scope of the work performed was not actually reduced. Ex. 3, Gross Dep. at 346:6-12; *Compare* Ex. 9, FLUOR-DIL_0000000897 *with* Ex. 10, FLUOR-DIL_0000001050 (showing increase of MMG staff relatively constant number of sites in the project during 2016).

12.    Disputed that the RFP acknowledged that the situation on the ground was fluid and that requirements could change during the anticipated 12-month performance period. The RFP stated that there may be adjustments "necessary *during negotiations* to account for quantifiable changes between the date of the RFP and the execution of the anticipated 12-month extension"

---

[4] *See also,* Ex. 8, FLUOR-DIL_0000000577, "2015 09 30 Ext_Authorized_Position_List" (spreadsheet dated Sept. 30, 2015 showing 8 sites and 510 MMG positions); Ex. 9, FLUOR-DIL_0000000897, "2016 05 16 Ext_Authorized_Position_List" (spreadsheet dated May 16, 2016 showing 8 sites and 409 MMG positions); and Ex. 10, FLUOR-DIL_0000001050, "2016 08 07 Ext_Authorized_Position_List" (spreadsheet dated Aug. 7, 2016 showing 9 sites and 420 MMG positions).

not that the requirements could change during the performance period. *See* Ex. K to Def's Mem. at FLUOR-DIL_0000054588 (Dkt. 146-12) (emphasis added).

13.    Disputed to the extent Fluor is suggesting that a "fixed" position would always be staffed by the same tier and grade level as that listed in the BOE. The tier and grade level of the person filling a "fixed" position could change during performance under Task Order 5. Ex. 4, Howard Dep. at 85:6-16.

14.    Disputed to the extent that Fluor contends that the Tier and Grade levels listed for the "Director" position could not be changed during performance of the contract. *Id*.

15.    Undisputed with the clarification that the budget was based on the BOE submitted to the government in the Spring of 2015. *Id.* at 99:13-100:22.

16.    Disputed that Gross was selected to serve as Director of the MMG because of his seniority and logistics experience with the U.S. Army. Dillard testified that when Gross arrived in Afghanistan, he "made no secret of the fact that" he was selected for the position because his salary was too high and if he was sent to the theater, Fluor could bill that salary to the government. Ex. 1, Dillard Dep. at 79:14-80:5 ("[Gross] made no secret of the fact that … the reason he was coming into Theater was because of his salary[.] … [H]is salary was impacting Fluor's rates in the home office, and that Fluor was not winning … the work necessary to basically keep him employed in the home office.").

17.    Disputed that Fluor first learned that its costs were forecasted to exceed the budget shortly after Fluor began performing the OY4 Extension. Fluor knew that it would need to make some staffing cuts prior to the start of its performance. The BOE submitted to the government on May 13, 2015 contemplated a reduction in staff. *See* Ex. M to Def's Mem (Dkt. 146-14). Thus, Fluor was aware as early as May 13, 2015 that its costs would exceed the budget. *Id*. Dillard

testified that cuts would have to be made to align the project with the BOE. Ex. 1, Dillard Dep. at 189:15-18. Dillard also testified that he first learned that a RIF would be needed in 2015 to "get aligned for the option year" in May or June of 2015. *Id*. at 156:15-22.

18.     Disputed that there is evidence to support that "Gross solicited analysis from Scott Roesler in Project Controls." Fluor has cited no evidence to support this. Disputed that "Project Controls routinely prepared such spreadsheets as an internal management tool for department managers." The cited testimony does not support this. Disputed that solicitation of the analysis from Roesler was the "initial step" in reducing costs. A RIF had previously been in the works as Dillard started developing a RIF plan under the direction of then Director of the MMD, Jarrold Reeves as early as July 2015. *Id.* at 189:3-18.

19.     Disputed that Project Controls did not make recommendations about specific positions to eliminate as part of RIF. *See* Pl's Resp. to Defs' SOF at ¶9.

20.     Undisputed with the clarification that, in the cited testimony, Gross stated that he directed Dillard that they needed to start planning the RIF, not that Gross directed Dillard to start planning because he would be included in the RIF.

21.     Disputed that O'Neill directed Gross to "lean toward" the most aggressive option. O'Neill testified that he did not recall making a decision at that meeting. Ex. 2, O'Neill Dep. at 123:3-23.

22.     Undisputed.

23.     Disputed that Gross identified a "handful" of additional positions for elimination. Gross testified that he did not recall how many additional positions he decided to eliminate but that it was "[p]robably in the single digits." Ex. 3, Gross Dep. at 269:16-22. The documents produced show that Gross identified four individuals to add to the RIF – Dillard and three of his

staff members that were all part of the audit compliance team (Minka Hill[5], Magdalena Kopevska and Sami Maloku). Ex. 11, FLUOR-DIL_0000000211 (Dillard Staffing Realignment Form ("SRF") signed Nov. 16, 2015); FLUOR-DIL_0000001258 (Hill SRF signed Nov. 8, 2015); FLUOR-DIL_0000001264 (Maloku SRF signed Nov. 8, 2015); FLUOR-DIL_0000006357 (Kopevska SRF dated Nov. 16, 2015).

Disputed as to Gross's timeline that he identified these additional positions for the RIF, discussed them with Howard and received approval from HR. The SRFs for the four individuals that were added to the RIF were signed on two different days and one week apart—November 8, 2015 for Hill and Maloku and November 16, 2015 for Dillard and Kopevska—which contradicts Gross's timeline that he identified all these individuals and had the entire RIF plan approved by HR at one time. *See*, Plaintiff's Statement of Undisputed Facts, *infra* ("Pl's SOF") at ¶17.

Disputed that the reason Gross decided to eliminate Dillard's position was because he no longer needed a Deputy Director. Gross provided contradictory testimony on this point when he testified that Dillard was added to the RIF because he wanted to consolidate the MMG to go from having three grade 18 staff to only one rather than because he was eliminating his position. Ex. 3, Gross Dep. at 258:14-258:1.

Lastly, disputed that the reason for the elimination of Dillard's position was to streamline and realign functions. While Gross and Snow may have offered testimony to support this position, a jury is could reasonably conclude that this testimony is after-the-fact pretext which is not credible and find that Dillard was eliminated in retaliation for reporting potential fraud against the Government by Fluor. *See generally,* Pl's Resp. to Def's SOF; Pl's SOF and legal arguments below. Notably there are literally no documents related to Gross's decision to streamline and

---

[5] Minka Hill's legal name is Minevere Korqua-McNamara. *See e.g.,* Ex. 11, FLUOR-DIL_0000001258.

realign the functions and no documents discussing his additional choices for termination. *See* Pl's SOF at ¶14.

24.    Disputed that Gross's decision to eliminate the MMG Deputy Director position was consistent with the practice of other departments within Fluor at the time. Fluor has cited no evidence to support this. Disputed that deputy positions were disfavored by the government and were being eliminated across the board. The testimony cited is disputed by the BOE presented to the government to obtain the OY4 Extension which included deputy positions. *See* Ex. M to Defs' Mem. (Dkt. 146-14) (2015 M&A BOE).

25.    Disputed that Gross did not need approval from O'Neill to eliminate any individual position. There is conflicting testimony as to who had ultimate authority for staffing decisions. *See* Pl's Resp. to Defs' SOF at ¶8.

26.    Undisputed.

27.    Disputed that Dillard was released from his assignment because the Deputy Director position was being eliminated. Deputy positions were not eliminated from the 2015 BOE provided to the U.S. Government. Ex. M to Defs' Mem. (Dkt. 146-14). In addition, there is evidence to support that Dillard was terminated in retaliation for reporting potential fraud against the Government. *See generally,* Pl's Resp. to Def's SOF; Pl's SOF and legal arguments below.

28.    Disputed that 133 Fluor employees and subcontractor employees were released. Rather 97 employees within the MMG were released. Ex. 10, FLUOR-DIL_0000001050.

Dillard does not dispute that his release from the project saved money in the short term as any staffing cuts would result in money savings. *See* Ex. 3, Gross Dep. at 255:25-256:4 (agreeing that adding anyone to the RIF would reduce costs). Disputed to the extent that Fluor contends that bringing Gross in to replace Reeves as the Director of the MMG saved money or was meant

to save money as Reeves's salary was lower than Gross's salary. *Id.* at 100:22-101:12, 168:20-24.

Disputed to the extent that Fluor contends that the reason Gross was brought to the theater to replace Reeves as the Director of the MMG was that it saved Fluor money because the salary of both Reeves and Dillard combined was more than that of Gross's salary alone. That the combined salary of Reeves and Dillard was more than that of the salary of Gross is irrelevant given that Fluor contends that, at the time Gross took over the Director position it had not yet planned to eliminate Dillard's position under the RIF and Gross testified that he did not decide to add Dillard to the RIF until November 2015. Ex. 3, Gross Dep. at 38:1-240:12. In contrast, to the extent that Fluor now contends that the salary of Reeves and Dillard combined was greater than Gross's salary ***and*** that this was the basis for bringing Gross to the field to take over the Director of MMG position, it provides support that Dillard was retaliated against. Gross took over the position of Director of MMG upon the approval of Howard and O'Neill. Ex. 12, FLUOR-DIL_0000001748, at 1751 (requisition form signed by Howard and O'Neal dated September 2, 2015); Ex. 3, Gross Dep. at 90:12-23. At the time of this approval, O'Neill was aware of Dillard's report regarding the discrepancies in the inventory reports. Ex. 13, Jones Dep. at 103:23-25.

Any contention that Gross was brought in to save money is also disputed by the fact that Dillard performed Reeves's job as the Director of the MMG for roughly 60 to 80 days of the year while Reeves was on R&R. Ex. 1, Dillard Dep. at 126:11-17, 129:20-130:9 ("whenever Jerry went on R&R I would assume the roles and responsibilities the [Reeves] performed"); Ex. 3, Gross Dep. at 110:22-111:7. Thus, Dillard was already doing the work of the Director of the MMG for approximately a quarter of the year prior to the time that Gross took over as the Director of MMG. Ex. 3, Gross Dep. at 111:11-17. Given that Dillard's salary was less than Gross's salary,

11

and Dillard had direct experience performing the duties of the Director of the MMG (Ex. 1, Dillard Dep. at 126:11-17, 129:20-130:9) it would have saved significantly more money to replace Reeves with Dillard rather than Gross.

Lastly, any contention by Fluor that Gross took over as Director of MMG to save Fluor money is disputed by Dillard's testimony that Gross "made no secret" that he was selected for the position of Director of the MMG because his salary was too high and if he was sent to the theater, Fluor could bill that salary to the government. *See* Pl's Resp. to Defs' SOF at ¶16.

29.    Disputed that the investigation into Dillard's complaint was initiated "promptly". The cited testimony does not support this statement.

30.    Disputed that Fluor "often provides this disclaimer to complainants" as Martial Robichaud, the lead investigator for Fluor with knowledge of the investigation into Dillard's complaint regarding the inventory reports, testified that he was aware of no other similar inadvertent disclosures. Ex. 14, Robichaud Dep. at 80:1-8. Disputed that Fluor takes confidentiality seriously given that there was an inadvertent disclosure outside of the "inner circle" of Dillard's complaint. *Id.* at 73:21-25. Disputed that Fluor takes confidentiality seriously as O'Neill was one of the individuals that was informed about Dillard's report of inventory discrepancies (Ex. 13, Jones Dep. at 103:22-24), and O'Neill had the ultimate authority over staffing decisions. *See* Pl's Resp. to Defs' SOF at ¶8. Disputed that Fluor takes retaliation seriously given that, after Dillard made a report of retaliation to Robichaud, Joy Willis, the Fluor investigator assigned to Dillard's retaliation complaint, recommended that Dillard's departure be delayed until the conclusion of the investigation, but that request was denied by members of upper management including O'Neill. Ex. 15, Willis Dep. at 107:10-1; Ex. 16, FLUOR-DIL_0000001851 (Transcript of phone call) at FLUOR-DIL_0000001912.

31.    Disputed that Gross did not know that Dillard had made the complaint at the time he decided to eliminate the Deputy Director position. While Gross testified that he was not aware that Dillard had made the complaint until May 2021, the following is evidence from which a reasonable jury could reject Gross' testimony and conclude that Gross is an unreliable witness and/or that he was aware that it was Dillard that made the complaint:

- Justin Jones, the subject matter expert assigned to the investigation into Dillard's complaint regarding the inventory reports, testified that he briefed Gross regarding Dillard's complaint before Gross came to Afghanistan. Ex. 13, Jones Dep. at 131:12-14; 132:6-7, 176:4-10. Gross was aware that Hill was responsible for ensuring the inventory reports at issue was done correctly and for validating those reports. Ex. 3, Gross Dep. at 140:1-18. Hill reported to Dillard. Ex. 1, Dillard Dep. at 49:25-50:1, 122:23-123:3.

- After the investigation into Dillard's reporting of the discrepancies in the inventory reports began, Juan Jones sent Gross an email on October 10, 2015 complaining about the audit compliance team and that he was being subjected to "ridiculous scrutiny" and "witch hunts". Ex. 17, FLUOR-DIL_0000013230-13232. Gross responded that he and Jones could meet the next day. *Id.*; Ex. 3, Gross Dep. at 188:19-189:5.

- O'Neill was aware that Dillard had made the report regarding the discrepancies with the inventory reports. Ex. 13, Jones Dep. at 103:23-25. O'Neill was Gross's direct supervisor and Gross had weekly hour-long meetings with O'Neill. Ex. 2, O'Neill Dep. at 81:13-16, 111:4-112:9. O'Neill broke Fluor's policies regarding privileged investigations and revealed to Reeves, the then Director of MMG, that Dillard had made the report, before the time Gross took over the Director position. Ex. 13, Jones Dep. at 117:12-17.

- Before departing for Afghanistan, Gross was briefed by Reeves "very extensively" and "arrived fully briefed on how the department was running." Ex. 2, O'Neill Dep. at 80:2-9.[6]

- Gross was copied on an email Justin Jones sent to Juan Jones detailing the recommendations or process improvements that were made based on what was found in the investigation into Dillard's report. Ex. 18, FLUOR-DIL_0000002123. Ex. 13, Jones Dep. at 128:5-9. When asked about this email, Gross testified that he does not recall having any discussion regarding inventory accuracy percentage requirements and testified that, at this time, he was unaware that someone had raised issues with the inventory reports (Ex. 3, Gross Dep. at 201:5-17, 206:6-13) despite that Justin Jones testified that he briefed Gross on this investigation and Gross was copied on the email. Ex. 13, Jones Dep. at 129:20-23, 131:12-14; Ex. 18, FLUOR-DIL_0000002123.

---

[6] Reeves was tragically killed during a terrorist attack prior to the start of discovery in this action. Ex.1, Dillard Dep. at 59:24-60:2.

13

- Gross testified that he was unable to recall (1) the circumstances with his meeting with Juan Jones following the October 10, 2015 "witch hunt" email discussed above (Ex. 3, Gross Dep. 188:19-189:16), (2) whether he ever discussed inventory issues with O'Neill (*id*. at 192:1-13), (3) any discussions regarding inventory issues or accuracy with O'Neill (*id*. at 192:1-13); or (4) any discussions, including with Justin Jones, regarding inventory loss percentages (*id*. at 204:9-205:10). In contrast, Gross is able to recall the circumstances surrounding Dillard's RIF during the same time period. *See e.g.*, *Id*. at 238:1-240:12, 257:20-258:15, 268:16-269:2.

- Gross provided contradictory testimony as to the reason he added Dillard to the RIF. *Compare*, Ex. 3, Gross Dep. at 258:14-259:1 (to reduce the number of grade 18 staff), *with* 269:8-14 (to eliminate the deputy position). Gross provided contradictory testimony as to the reason he added Hill to the RIF. *Compare, id.* at 258:14-259:1 (to reduce the number of grade 18 staff) *with* 266:20-268:15 (because he believed Dillard was protecting audit compliance team members from the RIF).

- Gross testified that he received a report in October 2015, before the RIF was approved, that Dillard was protecting individuals on the audit compliance team from RIFs and this motivated him to add audit compliance team members to the RIF. Ex. 3, Gross Dep. at 266:20-269:2. Fluor has not produced any documentation of such a report made from October 2015. Fluor has, however, produced documentation of such a complaint made on November 10, 2015 which is after Gross testified that the RIF was approved. Ex. 3, Gross Dep. at 238:3-241:25; Ex. 19, FLUOR-DIL_0000054339-54358 at FLUOR-DIL_000054352. Gross was interviewed in connection with the investigation into the November 10, 2015 complaint. Ex. 3, Gross Dep. at 310:5-12. The investigatory report does not mention any prior complaints that Dillard or Hill protected individuals from RIFs. *Id*. at 3126-313:16.

- Gross testified that the entire RIF plan had to be approved by HR prior to its execution (Ex. 3, Gross Dep. at 238:3-241:25), but the dates the SRF forms were signed for staff that Gross testified that he added to the RIF were different from the dates the SRF forms were signed for those that were in Dillard's proposed RIF plan. *See* Pl's SOF at ¶17.

- Although Gross testified that he was not aware that Dillard was the person that reported the inventory discrepancies until 2021, Willis had a meeting with Gross on January 12, 2016 to discuss Dillard's retaliation complaint. Ex. 20, FLUOR-DIL_0000015581.

32.    Undisputed that no one specifically told Dillard that Gross knew that he was the person that raised the concerns related to the inventories. However, it would have been reasonable for Dillard to infer that Gross knew Dillard had reported the concerns related to inventories given the inadvertent disclosure of Dillard as the source of the complaint (*see* Defs' SOF at ¶30) and that Justin Jones had informed Dillard that Gross was aware that a complaint had been raised

regarding the inventories. Ex. 1, Dillard Dep. at 252:6-13); Ex 15, Willis Dep. at 131:13-132:18 and Ex. 11 to the Willis Dep. (Transcript of Phone Conversation dated April 22, 2016) at 12:5-6 ("Justin told me that Gregg had been briefed").

33.    Undisputed.

**PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED FACTS**

1.    Dillard is a graduate of the US Military Academy at West Point. Ex. 1, Dillard Dep. at 10:15-21. After graduation, Dillard served on active duty in the United States Army from 2001 to 2007 where he deployed two times to the Republic of Korea and to Iraq, respectively. *Id.* at 11:11-12:4, 16:14-15. Dillard then served in the US Army Reserves after leaving active duty. *Id.* at 18:10-19:8. In 2008, Dillard received orders to active duty and was deployed in November of 2008 to Afghanistan where he served as a LOGCAP Support Officer for approximately one year. *Id.* at 22:9-23:8. Dillard left active duty in November 2009. *Id.* 26:12-14.

2.    Dillard received an offer to work for Fluor in December 2009. *Id.* at 35:10-15. Fluor sent Dillard to work for a short time in Iraq in 2010 as an operations and maintenance manager. *Id.* at 36:14-37:7. Dillard was then transferred to work as the Regional Distribution Center manager in Kabul, Afghanistan. *Id.* 37:24-38:10. Approximately one year later in October or November of 2011, Fluor sent Dillard to Bagram to work as a Project Specialist I. *Id.* at 40:6-14, 43:3-15. In approximately January of 2013, Dillard became the Deputy Manager of the MMG under Jarrold Reeves who was the Director of the MMG. *Id.* at 48:9-17. Dillard had a strong working relationship with Reeves. *Id.* at 83:3-16. Dillard continued to work under Reeves during his employment with Fluor until Gross replaced Reeves as the Director of MMG. *Id.* at 115:7-12.

3.    Dillard was responsible for the audit compliance team when he served as Deputy Director. *Id.* at 117:23-25. Hill ran the audit compliance team and reported to Dillard. *Id.* at 49:25-

15

50:1, 122:23-123:3. The audit compliance team conducted inspection audits in the MMG and created reports that were provided to Dillard and Reeves. *Id*. at 124:17-22; 125:7-13.

4.        Another of Dillard's responsibilities was to prepare RIF plans for the MMG. Ex. 1, Dillard Dep. at 65:2-7. The first RIF Dillard worked on occurred in 2011 and 2012. *Id*. at 115:16-116:1. The second RIF that Dillard worked on was executed in February of 2014. *Id*. at 116:17-20. The third RIF Dillard worked on was planned in 2015. *Id*. 156:15-18. Dillard first learned about the third RIF that he worked on in May or June of 2015 and Reeves requested that Dillard start working on that RIF in July 2015. *Id*. at 156:15-18, 189:5-6.

5.        In late July 2015, Dillard noted discrepancies in some of the inventory summary reports of the 10 percent inventories and he reported the issue to Justin Jones on July 27 or 28, 2015. Ex. 1, Dillard Dep. at 234:5-9, 243:12-19, Ex. 13, Jones Dep. at 83:16-25.. Dillard was concerned that these ten percent inventories were suspiciously high and that they may have been manipulated "via a term called 'washing inventory out.'" Ex. 13, Jones Dep. at 71:16-72:1. *See also* Ex. 14, Robichaud Dep. at 42:2-8 (Dillard reported that "inventories that were being conducted reflected … a hundred percent inventory and was not believable … in his assessment"). The inventory team was responsible for creating the 10 percent inventory reports (Ex. 13, Jones Dep. at 79:10-17) and Juan Jones was responsible for signing off on those reports. Ex. 7, Dillard Decl. at ¶5. Then, Hill was responsible for ensuring the 10 percent accuracy reporting was done correctly. Ex. 3, Gross Dep. at 140:1-18.

6.        The following individuals were informed about Dillard's report of the discrepancies if the inventory reports including that Dillard was the individual that made the report: O'Neill, Fluor Counsel, Chief Compliance Officer Dave Methot, the Fluor investigative team (including Robichaud, Lisa Wall, Andrew Johnson, Justin Jones, and Jim Gaffney), and

Reeves. Ex. 13, Jones Dep. at 103:23-104:2, 105:17-22, 117:13-18, 122:20-123:1; Ex. 14, Robichaud Dep at 59:17-23, 62:11-18.

7.      On July 31, 2015, Robichaud learned that Dillard's complaint and the ensuing investigation had been inadvertently disclosed to someone outside the appropriate circle. Ex. 14, Robichaud Dep. at 73:21-25. Robichaud informed Dillard of the inadvertent disclosure during a telephone call held on August 1, 2015. *Id*. at 76:16-77:9. During the call, Robichaud cautioned Dillard that if he faced any retaliation as a result of having made a complaint, that Fluor would conduct an appropriate investigation. *Id*. at 78:23-79:8, 130:2-5. Fluor did not investigate who the inadvertent disclosure was made to. *Id*. at 80:9-15.

8.      On or about August 3, 2015, just a few days after Dillard reported the discrepancies with the inventory reports and after he learned that there was an inadvertent disclosure of his complaint and the investigation, Dillard and Reeves presented the RIF plan to O'Neill that Reeves had asked Dillard to prepare in July 2015. Ex. 1, Dillard Dep. at 189:9-11. O'Neill declined to implement that RIF plan. *Id*. at 188:25-189:24. Fluor was aware at this point that (a) a RIF would be needed to align with the BOE (*see* Pl's Resp. to Defs' SOF at ¶17), (b) there was an impact and risk for Fluor in delaying execution of this RIF (Ex. 6, Roesler Dep. at 45:2-23, 46:11-49:5), and (c) that if Fluor had more staffing than was necessary to meet the customer's requirements, it would be better to correct that level of staffing sooner rather than later (Ex. 2, O'Neill Dep. at 65:20-66:3). However, O'Neill rejected the RIF plan presented on or about August 3, 2015. Ex. 1, Dillard Dep. at 188:25-189:24.

9.      After Gross arrived in Afghanistan in September 2015, O'Neill reversed course and directed Gross to start working on a RIF despite rejecting the prior RIF plan that had been presented to O'Neill while Reeves was still Director of the MMG. Ex. 1, Dillard Dep. at 190:21-

191:7; Ex. 3, Gross Dep. at 47:3-8; 118:9-19. Dillard thereafter began working on an updated

RIF plan that was based on the plan that had been presented to O'Neill in August 2015. Ex. 1,

Dillard Dep. at 192:3-9. Dillard then prepared a presentation for O'Neill that included three

different options for the proposed RIF. *Id*. at 205:24-206:5; 209:6-7. *See also*, Ex. N to Defs'

Mem. (Dkt. 146-15).

10.    During the time that Dillard was working on the presentation for O'Neill, on

October 10, 2015, Gross received an email from Juan Jones complaining that the audit

compliance team was subjecting him to "ridiculous scrutiny" and "witch hunts" on a daily basis.

Ex. 17, FLUOR-DIL_0000013230-13232. Gross responded to Juan Jones that he would meet

with him the next day. *Id*.; Ex. 3, Gross Dep. at 188:19-189:5. Juan Jones was responsible for

signing off on the inventory reports at issue in Dillard's report of potential fraud against the

government. Ex. 7, Dillard Decl. at ¶5.

11.    Also, during the time period that Dillard was preparing the RIF presentation for

O'Neill in the fall of 2015, the investigation into his complaint regarding the discrepancies with

the inventory reports concluded (Ex. 13, Jones Dep. at 128:1-9) and Dillard was notified that

certain process improvements had been made by Gross as a result of the investigation. Ex. 1,

Dillard Dep. at 249:20-250:20; 251:20-22. Juan Jones was responsible for implementing these

process improvements. *See* Ex. 18, FLUOR-DIL_0000002123. On October 22, 2015, Justin

Jones sent Juan Jones an email detailing certain recommendations that were made based on what

was found during the investigation into Dillard's report regarding the inventory reports. Ex. 18,

FLUOR-DIL_0000002123, Ex. 13, Jones Dep. at 128:5-9. Gross was copied on this email. Ex.

18, FLUOR-DIL_0000002123, Ex. 13, Jones Dep. at 129:16-19.

12.    On or about October 28, 2015, Dillard and Gross presented the three proposals for

a RIF plan that Dillard had prepared. Ex. 1, Dillard Dep. at 209:6-7; Ex. 3, Gross Dep. at 122:2-7. Following that presentation, Dillard began to work on a more specific RIF proposal but the selection criteria for which employees would be eliminated had already been set forth in the presentation to O'Neill so there was already a "good idea" of which employees would be included as part of the RIF. Ex. 1, Dillard Dep. at 209:21-210:23; 209:24-210:18; Ex. 3, Gross Dep. at 122:8-11; Ex. N to Defs' Mem. (Dkt. 146-15) at DILLARD000884. Dillard then prepared a spreadsheet listing the specific positions that would be included as part of the RIF entitled "MMG Tier I-IV Position" that Dillard sent to Gross via email on November 7, 2015. Ex. 1, Dillard Dep. at 215:21-216:22; Ex. 21, FLUOR-DIL_0000004926-FLUOR-DIL_0000004927.

13.    None of the planning documents leading up to the 2015 RIF listed either Dillard or his position as being up for elimination. The BOE listed Dillard's specific position—Project Specialist I, Tier I, Grade18—as being included in the estimate. Ex M to Defs' Mem. (Dkt. 146-14); Dillard Dep. at 151:21-152:1. The "Proposal vs OnHand Staffing" document prepared by Project Controls (Ex. 1, Dillard Dep. at 193:2-194:5) listed both Dillard's position and name as being included within the estimate that was submitted to the government. Ex. M. to Defs' Br. (Dkt. 146-14) (showing that Dillard's name or position was not highlighted); Ex. 3, Gross Dep. at 167:1-9 (testifying that the highlighted positions "indicate positions that are above the estimate that was submitted to the government."). None of the three courses of action for the RIF presented to O'Neill on October 28, 2015 listed Dillard or his position as being included in the RIF. Ex. N to Defs' Mem. (Dkt. 146-15); *see also* Ex. 3, Gross Dep. at 237:15-23 (testifying that none of the courses of action presented contemplated the elimination of either Dillard's or Hill's position). The RIF planning documentation prepared by Dillard after the presentation to O'Neill did not list Dillard as being included in the RIF. Ex. 21, FLUOR-DIL_0000004926-FLUOR-

DIL_0000004927.

14.     None of the additional individuals that Gross testified that he added to the RIF were included in the RIF plan presented to O'Neill. Ex. 5, Snow Dep. at 45:5-18. Fluor has produced no written documents showing that Gross added individuals to the RIF that were beyond what Dillard had proposed and Gross had approved. Ex. 3, Gross Dep. at 233:11-19. *See also*, *id.* at 265:3-7 (testifying that he did not know whether it was common to have a RIF plan in writing), 251:21-252:4 (testifying that he did not present his final RIF plan to anyone in writing); 254:16-22 (testifying that he believes he would have sent an email to HR to prepare additional SRF forms but Fluor did not produced any such emails); and 258:12-16 & 261:13-16 (testifying that he does not recall putting anything in writing regarding the desire to reduce the number of grade 18 staff, including Dillard, in the MMG).

15.     Gross decided to add individuals to the RIF even though he was unaware whether Dillard's plan as proposed and approved by Gross himself had been adjusted to get closer to the third, most aggressive plan, that was proposed to O'Neill. Ex. 3, Gross Dep. at 256:23-257:10.

16.     Fluor notified most employees included in the 2015 RIF on November 11, 2015. Ex. 1, Dillard Dep. at 218:9-10. Most of these employees were scheduled to depart on November 14, 2015. *Id.* at 218:9-10.

17.     Most of the employees that were included in the 2015 RIF had their SRF signed by Dillard on November 6, 2015. Ex. 1, Dillard Dep. at 269:16:270:1; *see also e.g.,* Ex. 22, FLUOR-DIL_0000006493 (example of SRF signed by Dillard dated November 6, 2015). The only SRFs for this 2015 RIF that were signed by Gross instead of Dillard were the SRFs for Dillard and three members of the audit compliance team (Hill, Magdalena Kopevska, and Sami Maloku). Ex. 1, Dillard Dep. at 269:16:270:1; Ex. 11, FLUOR-DIL_0000000211 (Dillard SRF

signed Nov. 16, 2015); FLUOR-DIL_0000001258 (Hill SRF signed Nov. 8, 2015); FLUOR-DIL_0000001264 (Maloku SRF signed Nov. 8, 2015); FLUOR-DIL_0000006357 (Kopevska SRF dated Nov. 16, 2015).

18.    In Mid-November 2015, Gross informed Dillard that he was to be included in the RIF after a majority of the staff that was included in the RIF had been notified. Ex. 1, Dillard Dep. at 218:5-20. The SRF form for Dillard signed by Gross states that Dillard was being included in the RIF to "align with the established Basis of Estimate" but Gross had not seen the BOE and listed Dillard's specific position as being included in the estimate.  Ex. 3, Gross Dep at 151:21-152:2, 336:10-337:6; Ex. M to Defs' Mem. (Dkt. 146-14).

19.    On January 4, 2016, Dillard sent Robichaud an email containing his allegations of retaliation. Ex. 14, Robichaud Dep. at 92:15-93:3, Ex. T to Def's Mem. (Dkt. 146-21).

## ARGUMENT

### A.    STANDARD OF REVIEW

To grant a motion for summary judgment, this court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id*. at 257. When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold*, Inc., 369 U.S. 654, 655 (1962). The judge must not weigh the evidence, but rather must determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.

**B.    PLAINTIFF HAS ESTABLISHED A *PRIMA FACIE* CASE OF RETALIATION**

**1.    Fluor Erroneously Contents That It Is Undisputed That Gross Was the Only Individual That Made the Decision to Include Dillard In the RIF.**

Fluor first argues that Dillard cannot establish a *prima facie* case of retaliation because he has failed to establish that "his employer had prior knowledge of the plaintiff's protected activity." *See* Defs' Mem. at 16-17. This argument should be rejected for three reasons.

First, there is substantial evidence to demonstrate that O'Neill and management in Greenville, South Carolina had final authority on staffing decisions and would have been involved in the 2015 RIF plan and the decision to include Dillard in the RIF. *See* Pl's Resp. to Defs' SOF at ¶8. O'Neill and leadership in Greenville had the final approval and authority on staffing decisions. *Id*. If leadership in Greenville did not intervene, O'Neill had authority to make decisions regarding staffing levels. *Id*. O'Neill also would have specifically approved Gross's staffing plan for the MMG, including the decision to include Dillard as part of the RIF. *Id*. The evidence also shows that O'Neill was aware that it was Dillard that had engaged in the protected activity. *See* Pl's Resp. to Defs' SOF at ¶¶ 30, 31. Thus, Fluor's argument that is undisputed that Gross was the decisionmaker with respect to the decision to include Dillard in the RIF should be rejected. *Harris v. hhgregg, Inc.*, No. 1:11CV813, 2013 WL 1331166, at *2 (M.D.N.C. Mar. 29, 2013) (plaintiff proffered evidence raising a genuine issue of material fact as to who the actual decisionmakers were with respect to her termination where the decision to terminate was signed-off on by one individual that relied on recommendations of two managers).

Second, assuming the undisputed testimony demonstrates that Gross was the sole decisionmaker (which Plaintiff disputes), the only evidence Fluor cites in support of its contention that Gross did not know that it was Dillard that made the complaint is Gross's own self-serving testimony. *See* Defs' Mem. at 16-17. However, "[a]ctual knowledge can be established through

direct evidence that the decisionmaker knew of the protected activity *or through circumstantial evidence from which a reasonable jury could infer that the decisionmaker knew of the protected activity*." *Vander Boegh v. EnergySolutions, Inc.*, 536 F. App'x 522, 530 (6th Cir. 2013) (citing *Mulhall v. Ashcroft*, 287 F.3d 543, 552-51 (6th Cir. 2002)). *See also*, *Kralowec v. Prince George's County, Maryland*, 503 F. Supp. 985 (D.Md.1980), *aff'd*, 679 F.2d 883 (4th Cir.), *cert. denied*, 459 U.S. 872 (1982) (holding that circumstantial evidence was sufficient to create a genuine issue of material fact as to whether the decision-maker had knowledge of the protected activity).

There is substantial evidence here from which a reasonable jury could reject Gross' testimony finding it to be after-the-fact pretext, and conclude that Gross is an unreliable witness and that he was aware that it was Dillard that made the complaint *See generally*, Pl's Resp. to Def's SOF at ¶31 (setting forth in detail the evidence that calls into question Gross's testimony that he lacked knowledge that Dillard made the complaint regarding the inventory reports). Likewise, the timeline of events and the facts set forth in Plaintiff's Statement of Undisputed Facts demonstrates that there are discrepancies in Gross's version of events and circumstantial evidence that Gross's was aware Dillard had made the complaint regarding the inventory reports.

Before departing for Afghanistan, Gross was briefed extensively by Reeves who was aware of Dillard's complaint. Pl's Resp. to Def's SOF at ¶31. The evidence clearly shows that Gross was told about a complaint had been made regarding the inventory reports and the investigation into that complaint, but Gross claims that he was unaware of any reports regarding discrepancies with inventory reports until 2021. *Id*. Gross was aware prior to the RIF that Juan Jones who was responsible for signing off on the inventory reports in question believed he was being subjected to "witch hunts." Pl's SOF at ¶10. Gross was included on the email containing the recommendations resulting from the investigation into Dillard's complaints. *Id*. at ¶11. Gross never put in writing

his reasoning for adding Dillard to the RIF and there are no documents that have been produced showing that Dillard was contemplated as being part of the RIF plan. *Id.* at ¶11. Gross testified that the entire RIF plan was approved by HR—including the decision to add Dillard to the RIF—but the dates the SRF forms were signed contradict this testimony. Pl's Resp. to Defs' SOF at ¶31, Pl's SOF at ¶17. While Fluor argues that Gross eliminated Dillard's position because he no longer needed a deputy (Def's Mem. at 16), Gross gave contradictory testimony as to the reason he included Dillard in the RIF. Pl's Rsp. To Def's SOF ¶31. Gross testified that he decided to include Dillard in the RIF even though he did not know whether Dillard's RIF plan was close to the third, most aggressive, RIF plan that they had presented to O'Neill. Pl's SOF at ¶15. Lastly, Gross testified that he added individuals to the RIF from the audit compliance team because of a report received in October 2015 that Dillard was protecting that team from a RIF. Pl's Resp. to Def's SOF at ¶31. Fluor did not produce any documentation of such a report made in October 2015 but did produce documents showing that such a complaint that was made on November 10, 2015, after the RIF plan had been approved. *Id.* This evidence shows that Gross was attempting to manufacture an after-the-fact pretextual justification for adding Dillard and members of the audit compliance team to the RIF and that he was aware of Dillard's or someone in audit compliance's reports regarding the inventories.

While Plaintiff has presented substantial evidence that Gross had knowledge of Dillard's protected activity, Courts have held that knowledge of the protected activity by the decisionmaker can be inferred from evidence of the decisionmaker's prior interaction with individuals with such knowledge of the protected activity. In *Kralowec*, a decision that was affirmed by the Fourth Circuit Court of Appeals, the plaintiff produced evidence that one county official knew of the plaintiff's complaint and that a second county official, who actually fired the plaintiff, had "prior

interactions" with the first official. 503 F. Supp. at 1010. The Court held that this made it "highly improbable ... that [the first official] would not have discussed plaintiff's complaint with [the second official] as soon as [the first official] obtained this information." *Id*. Therefore, the Court held that there was a genuine issue of material fact as to whether the first official had knowledge of the plaintiff's complaint. *Id*. *See also*, *Beeler v. Norton Healthcare, Inc.*, No. 3:17-CV-573-DJH-RSE, 2020 WL 1265419, at *10 (W.D. Ky. Mar. 16, 2020) (genuine issue of material fact as to knowledge of plaintiff's complaint where decisionmaker had prior interactions with individual with knowledge of complaint).

Here, Plaintiff has presented evidence that Gross had extensive interactions with both O'Neill and Reeves, both of whom had knowledge that it was Dillard that had made the complaint. Gross was briefed extensively by Reeves on the MMG prior to coming to Afghanistan. Pl's Resp. to Def's SOF at ¶31. O'Neill was Gross's supervisor, Gross met with O'Neill for an hour each week and O'Neill would have had to give final approval of the RIF. *Id*. at ¶¶ 8, 31. O'Neill made an unauthorized disclosure of Dillard's identity to Reeves. *Id*. at ¶31. Under *Kralowec*, this is sufficient evidence to create a genuine issue of material fact as to whether Gross knew it was Dillard that had made the complaint. However, Plaintiff has not just presented evidence of these "prior interactions". As set forth above, Plaintiff has presented substantial evidence, including Gross's inconsistent testimony and timeline, creating a genuine issue of material fact regarding Gross's knowledge.

Fluor is incorrect that this case is "on all four with" the decision is *Carr v. SRA International, Inc.*, No. 20-2692, 2021 WL 2285231, at *2 (3d Cir. June 4, 2021). In *Carr*, the Court noted that none of the direct supervisors of the individual that selected the plaintiff for a RIF had knowledge of the plaintiff's role in activity protected under the FCA. *Id*. at *3. Here, in

contrast, O'Neill, Gross's direct supervisor and ultimate decisionmaker with respect to the RIF, was aware that it was Dillard that had made the complaint regarding the inventory reports. Pl's Resp. to Def's SOF at ¶¶8, 31. In addition, the individual in *Carr* that had selected plaintiff for the RIF presented two RIF options to a supervisor—one that included the plaintiff and one that did not. *Carr*, 2021 WL 2285231, at *3. Here, in contrast, none of the written RIF documentation that was presented to O'Neill included Dillard in the RIF. Pl's SOF at ¶¶13, 14. In fact, none of the written RIF planning documentation included Dillard as being part of the RIF. *Id*. Lastly, the evidence described above demonstrating that Gross had knowledge that it was Dillard that made the complaint was not present in *Carr*.

Third, even assuming that Gross was the sole decisionmaker *and* assuming that the evidence presented by Plaintiff is insufficient to create a genuine issue of material fact as to whether Gross had knowledge that it was Dillard that made the report regarding the inventory reports, knowledge can be tied to Gross through a cat's paw theory. *Lowery v. CSX Transportation, Inc.*, 690 F. App'x 98, 100 (4th Cir. 2017). Under this theory, "a plaintiff 'need not prove that the decision-maker responsible for the adverse action knew of the protected activity if it can be established that those advising the decision-maker knew, regardless of their motives.'" *Id*. (quoting *Rudolph v. Nat'l R.R. Passenger Corp.*, ARB Case No. 11-037, 2013 WL 1385560, at *12 (Dep't of Labor Mar. 29, 2013)). Here, knowledge may be tied to Gross through O'Neill. O'Neill was aware that it was Dillard that made the complaint. Pl's SOF at ¶6. O'Neill was Gross's supervisor. Pl's Resp. to Def's SOF at ¶31. At the very least, even if O'Neill was not a decisionmaker, O'Neill advised Gross during the RIF process and had final approval over the RIF. *Id*. at ¶8. Further, Dillard would also have to demonstrate under the "cat's paw" theory that O'Neill was "motivated by [retaliatory] animus" and that his actions were "a proximate cause of the ultimate employment

action." *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011). The retaliatory animus can be demonstrated by the fact that, just a few days after Dillard made his complaint regarding the inventory reports, O'Neill declined to implement the first RIF that Reeves and Dillard presented despite that at this point O'Neill knew that one would be required to align with the BOE presented to the government. Pl's SOF at ¶8. This is evidence from which a reasonable jury could conclude that, because Reeves and Dillard had a strong working relationship (Pl's SOF at ¶2), O'Neill intentionally delayed a needed RIF until the new MMG Director arrived in Afghanistan at which point Dillard could be added to the RIF. The proximate cause of the ultimate decision can be demonstrated because O'Neill had the final authority over the RIF and advised or gave direction to Gross on the RIF. Pl's Resp. to Def's SOF at ¶8.

### 2.    Plaintiff Has Established a Causal Connection Between the Protected Activity and Dillard's Inclusion in the RIF.

To establish a *prima facie* case of retaliation under the FCA, the plaintiff must show that the employer took an adverse action as a result of protected activity. *United States ex rel. Complin v. N. Carolina Baptist Hosp.*, 818 F. App'x 179, 182 (4th Cir. 2020). "The Fourth Circuit and its courts have looked to factors articulated in the Third Circuit's *Farrell* decision, to determine whether causation had been established." *Mohammed v. Cent. Driving Mini Storage*, Inc., 128 F. Supp. 3d 932, 945 (E.D. Va. 2015) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.2000)). "In *Farrell*, the Third Circuit stated that causal connection can be established through various types of circumstantial evidence such as temporal proximity, intervening antagonism or retaliatory animus, inconsistent reasons for termination, or the defendant's conduct toward others." *Id*.

Fluor argues that Dillard has failed to produce causal evidence and cites several cases for the proposition that, for timing alone to give rise to an inference of retaliation, a gap of three

months is too long to infer a causal nexus. Def's Mem. at 18 (citing cases). As an initial matter, all the cases Fluor cites are distinguishable because none involved RIFs and the 2015 RIF required months of planning. *See* Pl's SOF at ¶4 (Dillard first started work on a 2015 RIF in July 2015) and ¶16 (majority of employees included in the RIF notified on November 11, 2015).[7] The very nature of how Fluor's RIFs were carried out explains why there was approximately three months between the adverse action and the retaliation. Given that Dillard was terminated under a RIF mechanism, the approximately three-months between the protected activity and adverse action still provides causal evidence that Dillard was included in the RIF as a result of the protected activity.

In any event, Plaintiff does not rely solely on temporal proximity to establish causation. In fact, the approximately three months between the protected activity and the adverse action provides evidence of the causal connection. Dillard and Reeves, who had a strong working relationship, initially presented a RIF plan to O'Neill on or about August 3, 2015. Pl's SOF at ¶8. This presentation occurred after Dillard reported the inventory discrepancies and after the inadvertent disclosure made by O'Neill. *Id*. at ¶¶ 5, 8, Pl's Resp. to Def's SOF at ¶31. Thus, at the time of this presentation, O'Neill had been informed about Dillard's report and his identity. *Id*. at ¶31; Pl's SOF at ¶6. Despite that Fluor knew at this time that a RIF would be needed to align with the BOE and despite that a delay in the RIF would be a risk to Fluor, O'Neill rejected the RIF plan presented by Dillard and Reeves. *Id*. at ¶8. Yet, inexplicably, O'Neill reversed course after Gross arrived to take over Reeves's position and requested that Gross start working on a RIF. *Id*. at ¶9. Given that O'Neill had knowledge of Dillard's protected activity, and he would have been aware

[7] *See Nifong v. SOC, LLC*, 234 F. Supp. 3d 739, 749 (E.D. Va. 2017) (violation of policies); *Perry v. Kappos*, 489 F. App'x 637, 639 (4th Cir. 2012) ("lackluster performance"); *Pascual v. Lowe's Home Centers, Inc*., 193 F. App'x 229, 231 (4th Cir. 2006) (performance failed to meet requirements); *Irving v. PAE Gov't Servs., Inc.*, 296 F. Supp. 3d 761, 768 (E.D. Va. 2017), aff'd, 736 F. App'x 412 (4th Cir. 2018) (performance issues, failure of leadership and intimidation or harassment); *Brach v. Conflict Kinetics Corp.*, No. 1:16-CV-978, 2017 WL 3267961, at *1 (E.D. Va. July 31, 2017) ("illegally accessed and tampered with defendant's computers").

of the strong working relationship between Reeves and Dillard, O'Neill's decision to delay the RIF until Gross took over Reeves's position is evidence from which a jury could conclude that O'Neill purposefully delayed the RIF because he would have known that Reeves would not easily include Dillard in the RIF.

In addition to the causal evidence relating to O'Neill's delay in implementing the RIF, Gross provided inconsistent testimony as to the reasons Dillard and the members of the audit compliance team were added to the RIF (*see* Pl's Resp. to Def's SPF at ¶31) and "a plaintiff may establish the [causal] connection by showing that the employer gave inconsistent reasons for terminating the employee." *Farrell*, 206 F.3d at 281. See also, *Mohammed*, 128 F. Supp. 3d at 946 ("Plaintiff has raised evidence of inconsistent explanations by Defendant for his termination which satisfy the causal element and allow Plaintiff to establish his *prima facie* case."); *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir.1986) ("The district court noted the inconsistency in [] explanations of its refusal to rehire"). Gross's testimony as to the timeline of when he decided to make additions to the RIF is also inconsistent and provides causal evidence that Dillard was included in the RIF as a result of the protected activity. *See* Pl's Resp. to Defs' SOF at ¶31. Specifically, Gross claimed that an October 2015 complaint regarding certain staff being "protected" from a RIF prompted him to add people to the RIF. *Id*. There is no documentation of such a complaint but there is documentation of such a complaint that was made *after* the RIF was finalized. *Id*. Lastly, although Gross testified that he did not have knowledge of anything related to Dillard's report of inventory discrepancies until 2021, there is substantial evidence that Gross had been briefed on the inventory issues. *Id*. (Jones testified that Gross was briefed on the issue, Gross was included on the email containing recommendations resulting from the investigation into the inventory issues, and Willis had a meeting with Gross in 2016 to discuss Dillard's retaliation

complaint).

**C.    FLUOR HAS FAILED TO PRODUCE SUFFICIENT EVIDENCE OF A NON-RETALIATORY REASON FOR DILLARD'S TERMINATION.**

Because Plaintiff has established a *prima facie* case of retaliation, the burden shifts to Fluor to establish a legitimate, non-retaliatory reason for Dillard's termination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Fluor contends that Dillard's position was eliminated because the scope of the work Fluor was required to perform was drawing down and personnel levels were being adjusted accordingly. Def's Mem. at 19-20. However, Plaintiff presented conflicting evidence showing that, by the time Fluor was performing under the OY4 Extension, Fluor had already significantly reduced or drawn down the scope of its sites in Afghanistan under the LOGCAP contract from approximately 76 sites to 9 sites. Pl's Resp. to Def's SOF at ¶11. In contrast, during this time, Fluor's sites remained relatively constant, fluctuating between 9 to 8 sites. *Id*. Gross also testified that Fluor later added employees to the MMG which supports that the scope of the work performed was not actually reduced. *Id*.

Fluor further argues that, because of this drawn down or reduction in personnel, Gross determined that the Deputy Director position was not necessary. Even assuming the legitimacy of Fluor's argument regarding the reduced scope of work, Gross gave contradictory testimony as to the reason for Dillard's inclusion in the RIF and the timeline for when he decided to add individuals was also inconsistent. Pl's Resp. to Def's SOF at ¶31. As set forth above and in more detail in in Section D. below, there is substantial evidence from which a reasonable jury could conclude that Gross is an unreliable witness and that his reasons for adding Dillard to the RIF are pretextual.

**D.    DILLARD HAS PRESENTED SUBSTANTIAL EVIDENCE THAT FLUOR'S TERMINATION OF DILLARD WAS PRETEXTUAL.**

Even if Fluor had properly established a legitimate, non-retaliatory reason for Dillard's termination, the evidence establishes that Fluor's proffered reason is pretextual.

First, the evidence supporting the causal element of Plaintiff's *prima facie* case likewise supports that Fluor's proffered reason for terminating Dillard is pretextual. *See* Section B. 2 (the RIF delay and Gross's inconsistent and/or contradictory testimony with respect to the timeline of events and reasons for including Dillard in the RIF).

Second, the lack of written documentation also supports that Fluor's reason is pretextual. Plaintiff has presented evidence that absolutely none of the RIF planning documentation starting with the BOE and concluding with the final spreadsheet listing all of the employees by name that were included in the RIF, listed that Dillard would be included in the RIF. Pl's SOF at ¶13. There are literally no written documents in the record to show that Dillard or the three members of the audit compliance team that were added to the RIF were to be included in the RIF, yet other RIF planning documents list all of the other individuals that would have been included in the RIF. *Id*. Gross testified that he would have sent an email to HR regarding adding Dillard to the RIF, but no such emails have been produced. *Id*. Fluor's failure to memorialize anything at all in writing related to Dillard's inclusion in the RIF provides evidence of pretext. *E.E.O.C. v. Sears Roebuck and Co*., 243 F.3d 846 (4th Cir. 2001) (a factfinder could infer from the fact that an employer's reasons for termination or failure to hire are articulated only long after the termination suggest pretext); *United States ex rel. Bachert v. Triple Canopy, Inc.*, 321 F. Supp. 3d 613, 623 (E.D. Va. 2018) (holding that the "lack of contemporary documentation" and "lack of a formal [] policy" provided evidence of pretext); *Laxton v. Gap, Inc*., 333 F.3d 572, 580 (5th 2003) (concluding a jury could reasonably find pretext when the employer "produced no contemporaneous written documentation of any employee complaints"); *Garrett v. Mercedes-Benz Fin. Servs. USA LLC*, 331 F. Supp. 3d 699, 723 (E.D. Mich. 2018) (holding that the defendants' failure to put reasons for terminating Plaintiff in writing was evidence of pretext). *Cf. Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627,

31

634-35 (7th Cir. 1996) (affirming punitive damage award and noting that "[t]he jury apparently concluded from the total absence earlier of the justification Coca-Cola would later offer at trial that the justification had been concocted in preparation for trial to fit the available facts."). The only contemporaneous documentation of Fluor's reasons for including Dillard's in the RIF is Dillard's SRF. This was a standard form that was completed for all employees included in the RIF and Gross signed Dillard's RIF *after* the RIF had been approved. Further, the justification in the SRF for Dillard's inclusion in the RIF reflected in that form is incorrect. The form states that Dillard was included in the RIF to "align with the established Basis of Estimate." However, Gross had never seen the BOE and, in fact, the BOE listed Dillard's specific position as being included in the estimate. Pl's SOF. at ¶18.

In its argument, Fluor points out that Plaintiff's allegation that Fluor's reason was pretextual because Dillard's "position was funded by name and individually unique salary in Fluor's Option Year proposal" is incorrect. Def's Mem. at 20-21. However, in his deposition, Dillard clarified that he was told that his position had been funded by name in the proposal but that he had not actually seen the proposal. Ex. 1, Dillard Dep. at 145:10-147:6, 199:24-200:11. Furthermore, while the BOE did not list Dillard by name, it did list his specific position as being included in the estimate. Pl's SOF at ¶13. Furthermore, none of the planning documents leading up to the RIF listed Dillard—by position or by name—as being up for elimination as part of a RIF. *Id*.

Third, that Fluor deviated from its normal RIF procedures with respect to Dillard and the three members of the audit compliance team is likewise evidence of pretext. "[A]n informal policy is no less a policy," and its selective, erratic, or "case-by-case" application by the employer may suggest pretext. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 297–99 (4th Cir. 2010).

The vast majority of those included in the RIF were processed under normal procedures; they were listed in RIF planning documentation, most of them received notice on November 11, 2015 and most of them had their SRF forms signed by Dillard. In contrast, none of the RIF planning documentation listed Dillard as being included in the RIF. Pl's SOF at ¶13. Dillard was notified that he was going to be part of the RIF in mid-November after most individuals included in the RIF has already been notified. *Id*. at ¶18. Only Dillard along with Hill (who was responsible for ensuring the accuracy of the inventory reports at issue in Dillard's complaint, Pl's Resp. to Def's SOF at ¶31, Pl's SOF at ¶5) and her team (Kopevska and Maloku) had their SRF forms signed personally by Gross. Pl's SOF at ¶17. A reasonable jury could conclude that given these departures from policy, Gross added Dillard and the audit compliance team members to the RIF to get rid of anyone that could have been involved in Dillard's complaint regarding the inventory reports. This evidence of departure from policies, combined with other evidence of pretext and the evidence of causation detailed above provide a reasonable basis for a jury to disbelieve the reason Fluor has articulated for Dillard's termination. *Stiles v. Gen. Elec. Co.,* 986 F.2d 1415, 1993 WL 46889, at *4 (4th Cir. 1993) ("[E]vidence indicating that [defendant] failed to follow established procedures helps [plaintiff] to raise a genuine dispute over whether [defendant's] stated reasons for his discharge were pretextual."); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006) ("[A]n employer's deviation from its own standard procedures may serve as evidence of pretext.").

Fluor argues that the planning documentation was simply "initial" proposals and that Gross had "exclusive responsibility" for determining which positions should be eliminated and which positions should be retained. Defs' Mem. at 21. The evidence directly disputes that Gross had exclusive responsibility as evidence shows that it was O'Neill that had final authority over any

RIF. Pl's Resp. to Defs' SOF at ¶8.

Lastly, Fluor's claim that Dillard was included in the RIF in an effort to save costs, reduce personnel levels and "flatten the organization across the board" (Defs' Mem. at 19) is belied by the evidence that (1) Fluor brought in an executive to replace Reeves when Gross's salary was significantly higher than Dillard's salary (Pl's Resp. to Def's SOF at ¶28), (2) Gross was brought to Afghanistan because his salary was "too high" so that costs of his salary could be passed on to the government (*id.* at ¶¶16, 28), (3) Fluor actually added employees to the MMG after Dillard was terminated (*id.* at ¶9), and (4) by 2015, Fluor had already completed the drawn down of its scope of work under the LOGCAP contract (*id.* at ¶11). This is substantial evidence of pretext from which "a trier of fact can 'reasonably infer' that a [Fluor] is covering up a [retaliatory] purpose with false explanations*." E.E.O.C. v. Siemens Maint. Servs., LLC*, No. C/A 3:07-1769-JFA, 2009 WL 363213, at *3 (D.S.C. Feb. 10, 2009). *See also Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005) ("'in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose'") (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000)); *Rowe v. Marley Co.*, 233 F.3d 825, 829 (4th Cir. 2000) (plaintiff may establish pretext "by showing that the employer's proffered explanation is unworthy of credence").

Fluor argues Plaintiff's allegation that it did not make business sense to eliminate Dillard's position given that his salary was less than Gross's salary cannot provide evidence of pretext because a court should not sit in judgment of employment decisions. Def's Mem. at 22. However, the evidence regarding Gross's salary is not meant as evidence that Fluor's business decision lacked wisdom. Rather, as set forth above, it is evidence that Fluor's proffered explanation for Dillard's termination (saving costs, flattening the organization *etc.*) simply was not true and was

pretextual given that Fluor brought in the very highly paid executive Gross to force out Reeves.

Fluor also argues that replacing Reeves with Gross as Director of the MMG somehow saved Fluor money (*see* Def's Mem. at ¶ 22) but the evidence cited by Fluor in support of this argument does not support Fluor's claim. There is no dispute that Gross's salary was higher than Reeves's salary. Pl's Resp. to Def's SOF at ¶28. Fluor makes the flawed and irrelevant argument that, because the salary of Reeves and Dillard *combined* was greater than that of Gross, it saved Fluor money. This fact is irrelevant because Fluor's position is that, at the time Gross took over the Director position, Fluor had planned to RIF Dillard and Gross testified that he did not decide to add Dillard to the RIF until early November 2015. *Id*. To the extent that Fluor now contends that the salary of Reeves and Dillard combined was greater than Gross's salary *and* that this was the basis for bringing Gross to the field to take over the Director of MMG position, it is evidence to support that Dillard was retaliated against. This is because Gross took over the position of Director of MMG upon the approval of Howard and O'Neill, and at the time of this approval, O'Neill was aware of Dillard's report regarding the discrepancies in the inventory reports. *Id*. Lastly, any contention that Gross was brought in to save Fluor money is disputed by the evidence that Gross was brought to the Afghanistan because his salary was too high. *Id*.

As set forth above, Plaintiff has presented substantial evidence from which a reasonable jury could determine that the true reason for his termination was retaliation.

## CONCLUSION

For the reasons set forth above, the Court should deny Fluor's motion for summary judgment.

Date: October 8, 2021                              Respectfully submitted,

                                                  EPPES & PLUMBLEE. PA

*s/ Frank L. Eppes*
Frank L. Eppes, Fed. ID 1003
PO Box 10066
Greenville, SC 29603
864-235-2600
(f) 864-235-4600
feppes@eppesandplumblee.com

**OF COUNSEL**

FROHSIN BARGER & WALTHALL
100 Main Street
Saint Simons Island, Georgia 31522
Tel: 205.933.4006

*s/ W. Tucker Brown*
William Tucker Brown
2001 Park Place North, Suite 1000
Birmingham, AL
205-488-1200
(f) 800-922-4851
tbrown@whatleykallas.com

**OF COUNSEL**

WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel: (205) 488-1200
Fax: (800) 922-4851

*Attorneys for Relator Scott Dillard*

## CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2021, a true and correct copy of the foregoing was

filed with the Clerk of Court using the electronic CM/ECF system, which will serve all counsel

of record.

*/s/ Frank L. Eppes*